UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _08/18/2023____
```

-------------------------------------------------------------------X

MICHAEL JOSEPH GIRAO,                     :
                                          :
                    Plaintiff,            :    **OPINION AND**
                                          :    **ORDER**
                                          :
        -v-                               :    22-CV-1419 (JLC)
                                          :
KILOLO KIJAKAZI,                          :
ACTING COMMISSIONER OF SOCIAL             :
SECURITY,[1]                              :
                                          :
                    Defendant.            :
-------------------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

Michael Joseph Girao seeks judicial review of a final determination made by Kilolo Kijakazi, the Acting Commissioner of the Social Security Administration (the "Commissioner"), denying his application for disability insurance benefits under the Social Security Act. The parties have cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, Girao's motion is denied, the Commissioner's cross-motion is granted, and the case is dismissed.

---

[1] Kilolo Kijakazi is now the Acting Commissioner of the Social Security Administration. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Acting Commissioner is substituted for the Commissioner as the defendant in this action.

# I.   BACKGROUND

## A. Procedural History

Girao applied for disability insurance benefits from the Social Security Administration ("SSA") on January 21, 2020, alleging a disability onset date of May 1, 2018, due to obesity, chronic pain symptoms, mastoiditis, degenerative disc disease, cervical radiculopathy, cervical spondylosis, tendonitis, and bilateral occipital neuralgia.  Administrative Record ("AR") at 11, Dkt. No. 15.[2]  Girao, represented by counsel, appeared and testified at a hearing held on March 8, 2021 before Administrative Law Judge ("ALJ") Laura Michalec Olszewski.  *See id.* at 30–86.  In a decision dated May 18, 2021, ALJ Michalec Olszewski found that Girao was not disabled.  *Id.* at 24.  On December 22, 2021, the Appeals Council denied a request for review, making the ALJ's decision final.  *Id.* at 1–4.

Girao timely commenced this action on February 21, 2022, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  *See* Complaint ¶ 1, Dkt. No. 1.  The Commissioner answered Girao's complaint by filing the administrative record on July 22, 2022.  Dkt. No. 15.  On September 19, 2022, Girao moved for judgment on the pleadings and submitted a memorandum of law in support of his motion.  Motion for Judgment on the Pleadings, Dkt. No. 16; Memorandum of Law in Support of the Plaintiff's Motion for Judgment on the Pleadings ("Pl. Mem."), Dkt. No. 17.  On November 18, 2022, the Commissioner

---

[2] Unless otherwise specified, the page numbers refer to the sequential numbering of the Administrative Record provided on the bottom right corner of the page, not the numbers produced by the Electronic Case Filing ("ECF") System.

cross-moved for judgment on the pleadings and submitted a memorandum in support of the cross-motion.  Cross-Motion for Judgment on the Pleadings, Dkt. No. 19; Memorandum of Law in Support of Commissioner's Cross-Motion for Judgment on the Pleadings ("Def. Mem."), Dkt. No. 20.  Girao filed reply papers ("Pl. Reply") on December 7, 2022.  Dkt. No. 21.

### B. Administrative Record

#### 1. Girao's Background

Girao was born on June 6, 1982, AR at 23, and lives in Croton-On-Hudson, New York.  *Id.* at 32.  He attended college but did not complete a degree.  *Id.* at 39. He previously worked as a general manager, assistant manager, and for the U.S. Coast Guard, *id.* at 47–50, but has not engaged in substantial gainful activity since at least May 1, 2018, his alleged onset date.  *Id.* at 13.  On that date, Girao returned from France (after residing there for approximately four years) and sought medical treatment because he was experiencing a substantial amount of pain that caused his functioning to "decline[ ] dramatically."  *Id.* at 70–71.

Girao applied for disability benefits based on his claimed impairments of: "[c]hronic head pain," "[c]hronic back pain," "[h]erniated disc, cervical spondylosis," "[s]pinal stenosis," "[o]steoarthritis in neck, cervical radiculopathy," "[o]ccipital neuralgia," "[c]hronic tubotympanic," and "chronic [m]astoiditis."  Form SSA-3368, *id.* at 342.  Girao further alleges to have pain in his lower back and "all over [his] head."  *Id.* at 52.

### 2.  Relevant Medical Evidence

Girao and the Commissioner have each provided a summary of the medical evidence contained in the administrative record.  *See* Pl. Mem. at 3–9; Def. Mem. at 5–7.  "The Court adopts these summaries, which do not materially conflict with each other, as accurate and complete for the purpose of considering the issues raised in this suit, except to the extent [it] discuss[es] additional records below." *Marinez v. Comm'r of Soc. Sec.*, 269 F. Supp. 3d 207, 210 (S.D.N.Y. 2017).  The Court will discuss the medical evidence pertinent to the adjudication of this case in Section II(B) of this opinion.

### 3.  The Hearing

#### a.  Girao's Testimony

On March 8, 2021, Girao appeared at a hearing before ALJ Michalec Olszewski, represented by his attorney, Gabriel Hermann.  AR at 30, 32. Vocational Expert ("VE") Fran Kurland, M.S., also appeared and testified.  *Id.*  At the time of the hearing, Girao was 39 years old, separated, and living with his parents.  *Id.* at 39–40.

In response to the ALJ's questions, Girao explained that he does not work and his parents support him financially.  *Id.* at 40–41.  Though Girao has a driver's license, he does not drive.  *Id.* at 41.  If he needs transport anywhere, he relies on his parents to drive him, and only to commute to doctor's appointments.  *Id.*  He has not taken any public transportation in the last three years.  *Id.*

The ALJ questioned Girao about his work history over the past 15 years. *Id.* at 42. Girao explained that the last time he worked was in 2012, following an injury in December 2010. *Id.* After stopping work, he moved to France in 2014 and lived in Paris for about a year before moving to Marseille and residing there for approximately three years. *Id.* at 42–43. During his time in France, Girao did not work but took business and private French language courses set up by the French employment office, Pole Emploi. *Id.* at 43–45. At one point, Girao interviewed for a position with the French government to work on its website, *id.* at 43, but the record does not indicate that he ever held such a position.

Before moving to France, Girao worked full-time for five years, first as an assistant manager, then as general manager at a liquor store, where he supervised 20 employees. *Id.* at 47–49. Prior to that, he worked as a deckhand and watch for the U.S. Coast Guard. *Id.* at 49–50. He also worked several part-time jobs throughout that 15-year period, including at a local wine store and for a French wine importer. *Id.* at 50–51.

Girao testified as to the following: on a typical day, he suffers from a massive amount of pain concentrated in his lower back from a slipped disc. *Id.* at 52. In the morning, to reduce the pain and increase movement, he takes medicine and attempts low-impact stretches. *Id.* at 53. If he stays in any one position for too long, however, the stiffness, pressure, and strain return. *Id.* Girao also struggles with showering, which limits his ability to shower to every other day. *Id.* at 54. Girao sleeps for several hours during the day, and the amount varies—he "could

sleep for 18 hours if [he] has to." *Id.* at 55.  In the week preceding the hearing, he slept for "three days straight." *Id.*

While Girao is in bed, he watches French classic movies, the French Discovery Channel, the French History Channel, and a Quebecois radio station, and is able to "follow what's going on." *Id.* at 57–58.  He does not have "phone service," but he does have internet and a laptop, which he uses to help his parents (who are both web developers) build a website.  *Id.* at 58.  He also spends "a lot of time on" software tutorials, and does "as much as [he] can in the morning." *Id.* at 58–59.  He "currently ha[s] a website running locally on [his] laptop" that he is "working on . . . all on [his] own . . . to learn." *Id.* at 59–60.

When the ALJ asked Girao if he helps his parents with any household chores, he replied that he only cleans up after himself and is limited to "having a little plastic bowl or something" because chores like vacuuming would "kill [his] back." *Id.* at 60–61.  When the ALJ probed Girao further about his participation in other household chores, Girao responded that his parents take care of everything.  *Id.* One time, he helped with a "little bit" of shoveling but "immediately felt [it]" for "the next, like, three days." *Id.*  Girao then clarified that it was not necessarily shoveling but using a broom that caused him to feel pain in his neck, back, and head. *Id.* at 62.

When the ALJ inquired about Girao's daily activities, he replied that he only gets out of bed "every once and a while [*sic*]" and to "just kind of crawl into a position, stretch, pull on [his] neck." *Id.*  He explained that he cannot stay in any

position for too long, whether lying down, sitting, or even standing.  *Id.*  Girao also testified that he is not being treated for any mental health issues but spoke with a psychiatrist before his most recent surgery.  *Id.*

Girao was then questioned by his attorney, Hermann, about his head and neck issues.  *Id.* at 63.  Girao explained that his pain is "at the base of the skull[,] . . . at the top of the back of the skull," and "all over," but that the top back of the skull seemed to be the "massive problem," making it hard for him to keep his head up.  *Id.*  Girao explained that when he sits, "within five to ten minutes . . . [he] feel[s] it . . . get[ ] intense to the point where [he] has to [lie] down."  *Id.*  Hermann asked whether his medication helps, and Girao explained that he "thinks it helps [him] to get rest and sleep[, which] seems to be the only thing that gets the [pain] to calm down."  *Id*. at 64.  He further relayed that the only effect of the medication seemed to be that it made him drowsy, causing him to sleep an excessive amount.  *Id.*

Hermann asked if Girao had undergone other procedures to alleviate the pain in his head, and Girao replied that he had.  *Id.* at 64–65.  Hermann asked whether these procedures consisted of shots and a spinal stimulation, and Girao replied affirmatively.  *Id*. at 65.  Hermann then asked whether he had experienced any pain relief from any of those procedures, and Girao said that he had not.  *Id.*

Hermann next inquired about Girao's understanding of the French movies that he watches.  *Id.* at 66.  He asked whether Girao was able to understand, focus, and follow the French movies regardless of the language; Girao replied, "[n]ot

without being distracted by [the pain]." *Id.* Girao then explained that listening to movies in a foreign language distracts him from the pain. *Id.* at 67.

Hermann asked whether Girao had any physical difficulties creating the website on his home computer, for instance using the mouse or the keyboard. *Id.* Girao replied that because it caused "[t]oo much strain" and he "c[ould not] focus," he "had to take so many breaks," which is "why it took [him] a week" to create the website. *Id.* Girao explained that he even had physical difficulty cutting apples. *Id.* When his parents come from shopping, though he offers to help put things away, he can only do so for a brief period before his pain arises again. *Id.* at 68.

Hermann followed up with Girao about maintaining a grip with his hands and fingers. *Id.* Girao responded that when he does "something in a repetition . . . , the pain" and "pressure . . . build[s]" until he has "to stop what [he is] doing." *Id.* Girao explained that it is also an issue of how he positions his head: any type of motion "triggers all types of pain from the joint injury, in the neck," and "throughout the back of the head." *Id.* at 69. Finally, Girao confirmed that there was a difference in pain from when he was in France in 2014 to when he returned in 2018. *Id.* at 70.

### b. The VE's Testimony

At the hearing, the VE identified two jobs that corresponded to Girao's prior work history: operations manager and Coast Guard deckhand. *Id.* at 74–75. The ALJ then posed a hypothetical individual to the VE:

> [of Girao's] age and education with the past jobs described
> [who] . . . can work at the light exertional level and . . .

> can lift and/or carry 20 pounds occasionally, ten pounds
> frequently, . . . can sit for six hours in an eight-hour work
> day, . . . can occasionally climb ramps and stairs, but
> should never climb ladders and scaffolds, . . . can
> occasionally balance and stoop, . . . should never kneel,
> crouch, or crawl[. T]he individual should work in a low
> stress environment defined as occasional use of judgment,
> occasional decision making and occasional changes in the
> work setting [interactions].  They can perform simple and
> routine tasks, they can have occasional indirections with
> supervisors, coworkers, public, they should avoid
> unprotected heights, operation of motor vehicles and
> operation of heavy—of hazardous machinery, and . . . can
> have occasional exposure to respiratory irritants such as
> dust, odors, fumes, gases, and extreme hot and cold
> temperatures.

*Id.* at 75.  The ALJ asked the VE if this hypothetical individual could perform any of

Girao's past work, and the VE replied that he could not.  *Id.*  The ALJ queried

whether the hypothetical individual could do any work, and the VE responded

affirmatively: the individual would be able to perform the role of a routing clerk, of

which there are 104,815 positions available in the national economy; a router, of

which there are 34,792 positions available; and a storage facility rental clerk, of

which there are 63,215 positions available.  *Id.* at 75–76.

The ALJ posed another hypothetical to the VE with the same restrictions as

the first hypothetical and

> further assum[ing] the individual can work at the
> sedentary exertional level, and that they can lift, hand, or
> carry ten pounds occasionally, they can sit for six hours in
> an eight-hour work day, sit or stand for two hours in an
> eight-hour work day, and the reaching restrictions is up to
> the limits of sedentary work.

*Id.* at 77.  The VE clarified that such an individual would not be able to do any of

Girao's past work, but would be able to perform the roles of document preparer, of

which there are 19,073 full-time-time positions available in the national economy;
surveillance system monitor, of which there are 2,968 positions available; and
appointment clerk, of which there are 143,228 positions available.  *Id.* at 77–78.

The VE further opined that employers will tolerate off-task behavior ten
percent of the time and one absence per month, but if it "became habitual,"
depending on the employer, the individual would not be able to maintain work.  *Id.*
For example, for jobs "that require[ ] production, . . . off task [behavior] . . . slow[s]
down the entire line," whereas in "office position[s], [off-task behavior] might be
able to be more compensable."  *Id.* at 78–79.  Regarding absenteeism, the VE
explained:

> it depends on the job and if other departments are . . .
> depending on the work of this individual.  But if it
> happened . . . for a month, [the individual] would probably
> get a warning.  If [the individual] w[as] off-task a little bit
> every day[,  t]hey would get a warning maybe after a
> week and by the end of the month it might result in
> termination.

*Id.* at 80.

Hermann then asked the VE what would happen if an individual's
limitations are "occasional reaching in all directions, not just overhead."  *Id.* at 82.
The VE replied that "[if] the job required that and [the individual] could[ ]n[o]t do
the work, then [he] either would[ ]n[o]t be hired at all or if [he was] hired and [it
was] found that [he] could[ ]n[o]t do every aspect of the job, that could be
problematic and preclusive."  *Id.*  Hermann asked whether there are any jobs that
are limited to "occasional handling and fingering" and the VE replied that there are
none, but there are two jobs that are limited to "occasional fingering."  *Id.* at 83–84.

In response to Hermann's questioning, the VE explained further that an individual's restriction to only "occasional movement of the head in all directions," depending on both the position and employer, could be work preclusive. *Id.* at 84.

### 4. The ALJ's Decision

In a 14-page decision dated May 18, 2021, ALJ Michalec Olszewski denied Girao's application for disability benefits, concluding that he was not disabled under § 1614(a)(3)(A) of the Social Security Act at any time since his alleged onset date. *Id.* at 24. In her analysis, the ALJ followed the five-step test for reviewing Social Security claims set forth in the SSA regulations. *See id.* at 13–24. At step one, she noted that Girao had not engaged in substantial gainful activity since his alleged onset date. *Id.* at 13. At step two, she determined that Girao suffered from the following "severe impairments: obesity, degenerative disc disease, cervical radiculopathy, cervical spondylosis, mastoiditis, chronic pain syndrome, tendonitis, and bilateral occipital neuralgia." *Id.*

At step three, the ALJ concluded that the record did not establish that Girao has an impairment or combination of impairments that meets or medically equals the criteria of any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 because the available records did not show any evidence "that the combined clinic findings from such impairments reach the level of severity contemplated" by those listings. *Id.* at 14. The ALJ explained the reasoning for her conclusion in reference to three listings: disorders of the skeletal spine (1.15); peripheral neuropathy (11.14); and obesity. *Id.* at 16. With respect to skeletal

spine disorders, the record did not establish "significant disc herniation or abnormal enhancement," as a cervical MRI showed "minimal disc bulging, with no disc herniation, and no spinal cord or nerve root compression." *Id.* at 15. With respect to peripheral neuropathy, the examination revealed that the motor strength was "full at 5/5 throughout[,] . . . sensory exam was normal, coordination was normal, and reflexes and gait were normal." *Id.* She also noted that Girao saw Dr. Dante Alexander for a "consultative psychiatric evaluation in May 2020" and that Dr. Alexander "reported that on [a] mental status exam, Girao's attention and concentration were only mildly impaired due to physical pain," and that the "[m]ental status exam was otherwise within normal limits," "[t]here was no psychiatric diagnosis," and Girao "would have mild limitation sustaining concentration and performing tasks at a consistent pace" as his "difficulties are caused by physical pain." *Id.* at 16.

The ALJ also considered Girao's obesity, and concluded that although it was severe, the "signs, symptoms and laboratory findings" were "not of such severity as found in any listing." *Id.* at 16. She noted that Girao's "limitations due to obesity [were] reflected" in her RFC analysis. *Id.*

At step four, the ALJ determined Girao has the RFC

> to perform sedentary work . . . except [he] can occasionally climb ramps and stairs but should never climb ladders and scaffolds. He can occasionally balance and stoop. He should never kneel, crouch and crawl. He should rarely reach overhead, but can frequently reach, push, and pull in all other directions up to the limits of sedentary work. He can frequently handle, finger, and feel.

*Id.* To reach this conclusion, the ALJ considered "all symptoms . . . reasonably . . . consistent with the objective medical evidence and other evidence" in a two-part analysis. *Id.* at 17. First, she determined whether Girao had any "medically determinable physical or mental impairment[s]"—as shown "by medically acceptable clinical or laboratory diagnostic techniques—that could reasonably be expected to produce the [claimed] . . . symptoms." *Id.* Second, she evaluated the "intensity, persistence, and limiting effects of [Girao's] symptoms to determine the extent to which they limit [his] work-related activities." *Id.* She noted that Girao "said he did talk to a psychiatrist about the occipital nerve stimulator, but he is not receiving any ongoing mental health treatment." *Id.*

The ALJ then assessed Girao's credibility and found that his "medically determinable impairments could reasonably be expected to cause the symptoms" he alleged, but that his "statements concerning the intensity, persistence and limiting effects of th[o]se symptoms [was] not entirely consistent" with medical and non-medical evidence. *Id.* The ALJ noted that Girao "did have a successful occipital stimulator trial that provided relief, but" apparently never "followed through with the permanent implant." *Id.* She further noted that Girao has "no mental diagnosis and [was] not treating for any mental issues—no therapy and no medication." *Id.* Additionally, Girao's "objective testing [was] wholly unremarkable," his mother spoke for him and alleged "excruciating and debilitating pain" during doctor visits, and there were "indications [in the record] that [his mother] coache[d him] to scream in pain if something hurt[ ]." *Id.* Finally, the ALJ observed that Girao

13

"watches YouTube videos and listens to music, he exercises three times per week, and he testified that he recently designed a website that runs on his laptop." *Id.* at 17–18.

The ALJ also assessed each medical evaluation in the record and determined whether it was persuasive based on its supportability and consistency with objective medical evidence. *Id.* at 18–22. She specifically noted Dr. Bruce Heckman's diagnoses of Girao and his opinion that Girao

> had constant, debilitating chronic neck pain going up his skull. [The] symptoms are constantly severe enough to interfere with attention and concentration, [Girao] was capable of significantly less than a full range of sedentary work, he would need to take unscheduled work br[eak]s, and he only has bad days. [Girao] is unable to work at this time.

*Id.* at 20. The ALJ concluded that Dr. Heckman's opinion was not persuasive because the "extreme limitations [he mentioned were] based solely on [Girao's] and his mother's subjective complaints." *Id.* Additionally, she concluded that it was "inconsistent with the objective findings" made by other medical providers whose findings she assessed in her decision, "which [were] unremarkable." *Id.*

The ALJ further noted that Girao's mental status was normal: a psychiatric evaluation conducted by Dr. Alexander showed that "[Girao's] attention and concentration were only mildly impaired due to physical pain." *Id.* at 16. She noted that Dr. L. Blackwell, a counseling psychiatrist, determined that there was "no psychiatric medically determinable impairment," and that this finding was persuasive because it was "consistent with [Girao's] lack of treatment for any mental health issues." *Id.* at 22. She also noted Dr. Patricia Tsui's diagnosis of

14

chronic pain syndrome and somatic symptom disorder and her conclusion that

Girao's "[m]ental status examination was within normal limits" and that there were

"no major psychological contraindications [to Girao's] proceeding with the occipital

nerve stimulator trial and permanent implant."  *Id.*

In the final component of step four, the ALJ concluded that Girao is "unable

to perform" any of his prior work.  *Id.* at 23.  However, at step five, she concluded

that "[t]here [were] jobs that exist in significant numbers in the national economy

that [Girao] c[ould] perform."  *Id.*  She explained that her conclusion was supported

by the VE's testimony that Girao would be able to perform the occupational

requirements of "document preparer . . .  surveillance system monitor . . . [,] and

appointment clerk[.]"  *Id.* at 24.  Thus, the ALJ found Girao was not disabled under

the Social Security Act.  *Id.*

## II.   DISCUSSION

### A. Legal Standards

#### 1. Judicial Review of the Commissioner's Decision

An individual may obtain judicial review of a final decision of the

Commissioner "in the district court of the United States for the judicial district in

which the plaintiff resides."  42 U.S.C. § 405(g).  The district court must determine

whether the Commissioner's final decision applied the correct legal standards and

whether the decision is supported by "substantial evidence."  *Butts v. Barnhart*, 388

F.3d 377, 384 (2d Cir. 2004).  "Substantial evidence is more than a mere scintilla.  It

means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting

*Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (quotation marks and alterations

omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("Under the

substantial-evidence standard, a court looks to an existing administrative record

and asks whether it contains 'sufficien[t] evidence' to support the agency's factual

determinations . . . whatever the meaning of 'substantial' in other contexts, the

threshold for such evidentiary sufficiency is not high." (quoting *Consol. Edison Co.

v. NLRB*, 305 U.S. 197, 229 (1938)).

The substantial evidence standard is a "very deferential standard of review."

*Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012). The Court

"must be careful not to substitute its own judgment for that of the Commissioner,

even if it might justifiably have reached a different result upon a *de novo* review."

*DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v.

Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)) (quotation marks and alterations omitted).

"[O]nce an ALJ finds facts, [a court] can reject those facts 'only if a reasonable

factfinder would have to conclude otherwise.'" *Brault*, 683 F.3d at 448 (quoting

*Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

In weighing whether substantial evidence exists to support the

Commissioner's decision, "the reviewing court is required to examine the entire

record, including contradictory evidence and evidence from which conflicting

inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722

F.2d 1033, 1038 (2d Cir. 1983)). On the basis of this review, the court may "enter,

upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding . . . for a rehearing."  42 U.S.C. § 405(g).  However, "[w]hen there are gaps in the administrative record or the ALJ has applied an improper legal standard, [the court has], on numerous occasions, remanded to the [Commissioner] for further development of the evidence."  *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (alteration in original) (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)).

## 2. Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A); *see also Colgan v. Kijakazi*, 22 F.4th 353, 357 (2d Cir. 2022).  Physical or mental impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  "[T]he ALJ should consider not only whether Plaintiff was disabled at the time of the hearing, but also whether Plaintiff was entitled to disability benefits for any closed, continuous period . . . following the date of his claim."  *Love v. Kijakazi*, No. 20-CV-1250 (EK), 2021 WL

17

5866490, at *5 (E.D.N.Y. Dec. 10, 2021) (quoting *Williams v. Colvin*, No. 15-CV-144 (WMS), 2016 WL 3085426, at *4 (W.D.N.Y. June 2, 2016)); *see also Milliken v. Saul*, No. 19-CV-9371 (PED), 2021 WL 1030606, at *9 (S.D.N.Y. Mar. 17, 2021) ("A 'closed period' of disability occurs where a claimant is found by the Commissioner to be disabled for a finite period of time which began and ended prior to the date of the agency's administrative determination of disability.").

In assessing a claimant's impairments and determining whether they meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'" *Mongeur*, 722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)). Specifically, the Commissioner's decision must consider factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id.* (citations omitted).

### a.   Five-Step Inquiry

"The Social Security Administration has outlined a 'five-step, sequential evaluation process' to determine whether a claimant is disabled[.]" *Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019) (citations omitted); 20 C.F.R. § 404.1520(a)(4).  First, the Commissioner establishes whether the claimant is presently employed.  *See* 20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is

unemployed, the Commissioner goes to the second step and determines whether the claimant has a "severe" impairment restricting his or her ability to work.  20 C.F.R. § 404.1520(a)(4)(ii).  If the claimant has such an impairment, the Commissioner moves to the third step and considers whether the medical severity of the impairment "meets or equals" a listing in Appendix One of Subpart P of the regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  If so, the claimant is considered disabled.  *See id.*; 20 C.F.R. § 404.1520(d).

If the claimant's impairment does not meet or equal a listed impairment, then the Commissioner continues to the fourth step and determines whether the claimant has the RFC to perform his or her past relevant work.  *See* 20 C.F.R. § 404.1520(a)(4)(iv).  Finally, if the claimant does not have the RFC to perform past relevant work, the Commissioner completes the fifth step and ascertains whether the claimant possesses the ability to perform any other work.  *See* 20 C.F.R. § 404.1520(a)(4)(v).

The claimant has the burden at the first four steps.  *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008).  If the claimant is successful, the burden shifts to the Commissioner at the fifth and final step, where the Commissioner must establish that the claimant has the ability to perform some work in the national economy.  *See, e.g., Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b.   Duty to Develop the Record

"Regardless of its source, the ALJ must evaluate every medical opinion in determining whether a claimant is disabled under the [Social Security] Act."  *Pena*

*ex rel. E.R. v. Astrue*, No. 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y.

Mar. 25, 2013) (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)) (quotation marks

omitted).  For Supplemental Social Security Income and Social Security Disability

Insurance applications filed prior to March 27, 2017, SSA regulations set forth the

"treating physician rule," which required an ALJ to give more weight to the

opinions of physicians with the most significant clinical relationship with the

plaintiff.  20 C.F.R. §§ 404.1527(c)(2), 416.927(d)(2); *see also, e.g.*, *Taylor v.

Barnhart*, 117 F. App'x 139, 140 (2d Cir. 2004).  Under the treating physician rule,

an ALJ was required to give "good reasons," 20 C.F.R. § 404.1527(c)(2), if he

determined that a treating physician's opinion was not entitled to "controlling

weight," or at least "more weight," than the opinions of non-treating and non-

examining sources.  *Gonzalez v. Apfel*, 113 F. Supp. 2d 580, 588 (S.D.N.Y. 2000).  In

addition, a consultative physician's opinion was generally entitled to "little weight."

*Giddings v. Astrue*, 333 F. App'x 649, 652 (2d Cir. 2009).

      However, in January 2017, the SSA revised its regulations regarding the

evaluation of medical opinion for claims filed on or after March 27, 2017 (such as

Girao's claim in this case).  *See* REVISIONS TO THE RULES REGARDING THE

EVALUATION OF MEDICAL EVIDENCE, 82 Fed. Reg. 5844, 5869–70 (Jan. 18, 2017).  "In

implementing new regulations, the SSA has apparently sought to move away from a

perceived hierarchy of medical sources."  *Velasquez v. Kijakazi*, No. 19-CV-9303

(DF), 2021 WL 4392986, at *19 (S.D.N.Y. Sept. 24, 2021) (citing 82 Fed. Reg. 5844

(Jan. 18, 2017)).  The new regulations state that an ALJ need "not defer or give any

specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." *Id.* (quoting 20 C.F.R. §§ 404.1520c(a), 416.1520c(a)). "Instead, an ALJ is to consider all medical opinions in the record and 'evaluate their persuasiveness' based on the following five 'factors': (1) supportability, (2) consistency, (3) relationship with the claimant, (4) specialization, and (5) any 'other' factor that 'tend[s] to support or contradict a medical opinion.'" *Id.* (quoting 20 C.F.R. §§ 404.1520c(a)–(c), 416.920c(a)–(c)).

Notwithstanding the requirement to "consider" all of these factors, the ALJ's duty to articulate a rationale for each factor varies. 20 C.F.R. §§ 404.1520c(a)–(b), 416.920c(a)–(b). Under the new regulations, the ALJ must "explain how he considered" both the supportability and consistency factors, as they are "the most important factors." 20 C.F.R. §§ 404.1520c(b)(2), 416.1520c(b)(2); *see also, e.g., Russ v. Comm'r of Soc. Sec.*, 582 F. Supp. 3d 151, 160 (S.D.N.Y. 2022) ("[t]he new regulations give most importance to two of the same factors previously considered to determine whether a treating doctor's opinion should be given controlling weight," referring to the supportability and consistency factors). Evaluating "supportability is an inquiry geared toward assessing how well a medical source supported and explained their opinion(s)." *Acosta Cuevas v. Comm'r of Soc. Sec.*, No. 20-CV-502 (KMW) (KHP), 2021 WL 363682, at *10 (S.D.N.Y. Jan. 29, 2021) *adopted by*, 2022 WL 717612 (Mar. 10, 2022). With regard to consistency, "the new rules provide that the greater the consistency between a particular medical source/opinion and the

other evidence in the medical record, the stronger that medical opinion becomes." *Id.* (citing 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(3)); *see generally* 42 U.S.C. § 423(d)(5)(B) (requiring ALJ to base decision on "all the evidence available in the [record]").

In addition, under the new regulations, the ALJ is required to consider, but need not explicitly discuss, the three remaining factors (relationship with the claimant, specialization, and other factors tending to support or contradict a medical opinion). *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). "[W]hen the opinions offered by two or more medical sources about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same, the ALJ [should] articulate how he considered the remaining factors in evaluating the opinions." *Jacqueline L. v. Comm'r of Soc. Sec.*, 515 F. Supp. 3d 2, 8 (W.D.N.Y. 2021) (citing 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3)) (quotation marks removed).

Courts considering the application of the new regulations have concluded that "the factors are very similar to the analysis under the old [treating physician] rule." *Velasquez*, 2021 WL 4392986, at *20 (quoting *Dany Z. v. Saul*, 531 F. Supp. 3d 871, 885 (D. Vt. 2021)); *see also Acosta Cuevas*, 2021 WL 363682, at *9 (collecting cases) ("the essence of the rule remains the same, and the factors to be considered in weighing the various medical opinions in a given claimant's medical history are substantially similar"). "This is not surprising considering that, under the old rule, an ALJ had to determine whether a treating physician's opinion was *supported* by

22

well-accepted medical evidence and *not inconsistent* with the rest of the record before controlling weight could be assigned." *Acosta Cuevas*, 2021 WL 363682, at *9; *see also e.g., Andrew G. v. Comm'r of Soc. Sec.*, No. 19-CV-942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020) ("consistency and supportability" were foundation of treating physician rule).

"The failure to properly consider and apply" supportability and consistency "is grounds for remand." *Prieto v. Comm'r of Soc. Sec.*, No. 20-CV-3941 (RWL), 2021 WL 3475625, at *9 (S.D.N.Y. Aug. 6, 2021); *see also Rosario v. Comm'r of Soc. Sec.*, No. 20-CV-7749 (SLC), 2022 WL 819810, at *8 (S.D.N.Y. Mar. 18, 2022) ("ALJ must explain in all cases how [he or she] considered" supportability and consistency); *Rivera v. Comm'r of Soc. Sec.*, No. 19-CV-4630 (LJL) (BCM), 2020 WL 8167136, at *22 (S.D.N.Y. Dec. 30, 2020), *adopted by*, 2021 WL 134945 (Jan. 14, 2021) (remanding so ALJ can "explicitly discuss both the supportability and consistency of the consulting examiners' opinions"). "An ALJ's failure to apply the correct legal standard constitutes reversible error if that failure might have affected the disposition of the case." *Lopez v. Berryhill*, 448 F. Supp. 3d 328, 341 (S.D.N.Y. 2020) (citing *Kohler*, 546 F.3d at 265). However, the Court need not remand the case if the ALJ only committed harmless error, *i.e.*, where the "application of the correct legal principles to the record could lead only to the same conclusion." *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (alteration omitted) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

### d.   Claimant's Credibility

An ALJ's credibility finding as to the claimant's disability is entitled to deference by a reviewing court. *See Osorio v. Barnhart*, No. 04-CV-7515 (DLC), 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006). "[A]s with any finding of fact, '[i]f the Secretary's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints." *Id.* (quoting *Aponte v. Sec'y of Health & Hum. Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)). Still, an ALJ's finding of credibility "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." *Peña*, 2008 WL 5111317, at *10 (quotation marks omitted) (quoting *Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988)). "The ALJ must make this [credibility] determination 'in light of the objective medical evidence and other evidence regarding the true extent of the alleged symptoms.'" *Id.* (quoting *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984)).

SSA regulations provide that statements of subjective pain and other symptoms alone cannot alone establish disability. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)). The ALJ must follow a two-step framework for evaluating allegations of pain and other limitations. *Id.* First, the ALJ considers whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce" the symptoms alleged. *Id.* (citing 20 C.F.R. § 404.1529(b)). "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the

claimant's] symptoms can reasonably be accepted as consistent with the objective

medical evidence and other evidence' of record." *Id.* (citing 20 C.F.R.

§ 404.1529(a)).   Among the kinds of evidence that the ALJ must consider (in

addition to objective medical evidence) are:

> 1. The individual's daily activities; 2. [t]he location,
> duration, frequency, and intensity of the individual's pain
> or other symptoms; 3. [f]actors that precipitate and
> aggravate the symptoms; 4. [t]he type, dosage,
> effectiveness, and side effects of any medication the
> individual takes or has taken to alleviate pain or other
> symptoms; 5. [t]reatment, other than medication, the
> individual receives or has received for relief of pain or
> other symptoms; 6. [a]ny measures other than treatment
> the individual uses or has used to relieve pain or other
> symptoms (*e.g.*, lying flat on his back, standing for 15 to
> 20 minutes every hour, or sleeping on a board); and 7.
> [a]ny other factors concerning the individual's functional
> limitations and restrictions due to pain or other
> symptoms.

*Peña*, 2008 WL 5111317, at *11 (citing SSR 96-7p, 1996 WL 374186, at *3 (SSA July

2, 1996)).

### B. Analysis

Girao appeals the ALJ's decision on two grounds: first, he argues that the

ALJ failed to adequately consider his mental impairments.  *See* Pl. Mem. at 11.

Second, he claims that the ALJ did not properly evaluate Dr. Heckman's opinion.

*Id.* at 16.  Each contention is addressed in turn.

### 1. The ALJ Adequately Considered Girao's Mental Impairments

At step two, the ALJ is required to "consider the medical severity of [the

claimant's] impairment(s)."  20 C.F.R. § 404.1520(a)(4)(ii).  In the case of a claimed

mental impairment, the severity determination must also include the "special technique" set forth in § 404.1520a(b)–(e).[3]

In her decision, the ALJ conducted neither the severity analysis nor the "special technique" with respect to the mental impairments of anxiety, depression, and somatic symptom disorder.  Girao argues that this was in error because of the consistent showing in the record of the effect of his depression and anxiety on his ability to maintain attention and concentration, and Dr. Tsui's diagnosis of somatic symptom disorder.  *See* Pl. Mem. at 12–13.

### a. Girao's Alleged Mental Impairments Were Not Medically Determinable

As a threshold matter, "only medical[ly] determinable impairments can be considered severe or non-severe."  *Marc G. v. Comm'r of Soc. Sec.*, No. 20-CV-1032 (CFH), 2022 WL 675701, at *8 (N.D.N.Y. Mar. 7, 2022) (quoting *Talbot v. Colvin*, No. 13-CV-1249 (GTS), 2015 WL 5512039, at *6 (N.D.N.Y. Sept. 15, 2015)).  Girao argues that the ALJ erred first by failing to explain whether his mental impairments were medically determinable.  *See* Pl. Mem. at 13.  The records he cites to support that proposition show that:

- The "functional capacity assessment" of Girao's primary care provider, Dr. Heckman, AR at 451, displays checked boxes next to "depression" and "anxiety" and the corresponding note: "due to pain," *id.* at 453;
- Dr. Heckman prescribed oxycodone for "chronic pain syndrome," *id.* at 470, 509, 784;

---

[3] The "special technique" proceeds as follows: the ALJ (1) "evaluate[s the] pertinent symptoms, signs, and laboratory findings to determine whether [the claimant] ha[s] a medically determinable mental impairment, 20 C.F.R. § 404.1520a(b)(1); (2) "rate[s] the degree of functional limitation resulting from the impairment(s)," § 404.1520a(b)(2); and (3) "determine[s] the severity of [the] mental impairment(s)." § 404.1520a(d).

- Dr. Heckman prescribed amitriptyline for "mixed anxiety and depressive disorder," *id.* at 510, 784;
- Dr. Heckman noted that Girao's symptoms were severe enough to "constantly" interfere with "attention and concentration," *id.* at 453;
- Dr. Heckman reported that Girao "cannot focus" because "the pain is too high," *id.* at 454;
- Dr. Tsui, a clinical psychologist, diagnosed Girao with chronic pain syndrome and "[s]omatic symptom disorder, moderate, with predominant pain" at two tele-visits to address strategies for coping with "neck and headache pain." *Id.* at 987, 995.

*See* Pl. Mem. at 12–13 (citing records listed above).

The ALJ is not permitted to rely on Girao's statements alone to establish that there is a medically determinable impairment. She may only rely on "objective medical evidence from an acceptable medical source," which means "anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1521; *see also Marc G.,* 2022 WL 675701, at *8 ("The inquiry is whether there was enough objective medical evidence to indicate that it was an ongoing problem."). A "statement of symptoms, a diagnosis, or a medical opinion" is not sufficient. 20 C.F.R. § 404.1521. Notably, Girao has not pointed to any "objective medical evidence from an acceptable medical source" to support his alleged mental impairments.

Regarding Girao's anxiety and depression, which according to Dr. Heckman's own notes, were "due to pain," AR at 453, the ALJ noted in her discussion of medically determinable impairments that Girao "has no mental diagnosis and is not treating for any mental issues—no therapy and no medication." *Id.* at 17. She elsewhere observed that Girao was "not receiving any ongoing mental health

27

treatment," *id.,* and that two consulting psychiatrists (Dr. Blackwell and Dr. T. Inman) "concluded there was no psychiatric medically determinable impairment." *Id.* at 22.

The ALJ further evaluated Girao's mental impairments in her discussion of the medical providers' findings.  For instance, she noted that Dr. Alexander's consultative psychiatric evaluation resulted in a "[m]ental status exam . . . within normal limits" despite "attention and concentration . . . mildly impaired due to physical pain" and "no psychiatric diagnosis."  *Id.* at 21.  The ALJ's observation was "consistent with the evidence showing Girao has no history of diagnosis or treatment of any significant mental health issues."  *Id.* at 21.

Somatic symptom disorder is mentioned in the record only by Dr. Tsui, the psychiatrist who saw Girao for two "pain psychology" visits.  AR at 985–87, 994–96.  In addition to citing Dr. Tsui's diagnosis of "chronic pain syndrome and somatic symptom disorder," the ALJ noted Dr. Tsui's asessment that Girao's "[m]ental status examination was within normal limits."  AR at 22.

In *Marc G.*, a claimaint successfully challenged the ALJ's failure to consider whether his somatic symptom disorder was a mental impairment.  2022 WL 675701, at *15–16.  Though "no medical provider or examiner diagnosed plaintiff with somatic symptom disorder," the court nevertheless found error because the ALJ also "did not find any of plaintiff's diagnosed mental health impairments severe or subsequently consider their severity in the remainder of his analysis."  *Id.* at *12.

Here, although Dr. Tsui diagnosed somatic symptom disorder based on Girao's complaints, its appearance in the record is nevertheless "insufficient to satisfy his burden of proving a medically determinable impairment." This is because, first, as explained above, the ALJ specifically considered whether Girao's other mental impairments were medically determinable. Second, there is no indication that Girao "required or pursued any treatment that would indicate a severe impairment: [he] did not receive any form of counseling for [his] depression or somatic symptoms disorder." *Catherine M. v. Comm'r of Soc. Sec.,* No. 21-CV-6283 (CJS), 2023 WL 2623590, at *6 (W.D.N.Y. Mar. 24, 2023).

Moreover, the ALJ is only required to consider the "medically determinable impairments of which [she is] *aware.*" 20 C.F.R. § 404.1545(a)(2) (emphasis added). Girao did not list anxiety, depression, somatic symptom disorder, or any other mental impairment in the disability report he submitted with his initial application for benefits, nor in the disability report he submitted for his appeal. *See* Form SSA-3368, AR at 342 (listing "[c]hronic head pain," "[c]hronic back pain," "[h]erniated disc, cervical spondylosis," "[s]pinal stenosis," "[o]steoarthritis in neck, cervical radiculopathy," "[o]ccipital neuralgia," "[c]hronic tubotympanic," and "chronic [m]astoiditis"); Form SSA-3441, AR at 378 (Question: "Since you last told us about your medical conditions, do you have any NEW physical or mental conditions?"; Response: "No"); *see also, e.g., Jeffrey G. v. Comm'r of Soc. Sec.,* No. 20-CV-1016 (ATB), 2021 WL 4844146, at *6 (N.D.N.Y. Oct. 18, 2021) ("It also bears noting that plaintiff did not list carpal tunnel syndrome as a physical condition that limited his

29

ability to work in his initial application."). Nor did Girao list any mental impairments in his Request for a Hearing by an ALJ. *See* Disability Appeal dated November 20, 2020, AR at 219 ("Reason for Appeal: I suffer from cervical spondylosis, spinal stenosis, osteoarthritis, occipital neuralgia, chronic tubotympanic and chronic mastoiditis."); *see also, e.g., Jeffrey G.*, 2021 WL 4844146, at *6 (noting same). At the hearing, the ALJ specifically asked Girao if he was "being treated for mental health," and Girao replied that he was not, although he "did talk to a psychiatrist before a surgery recently." AR at 62. "The Court [therefore] cannot fault the ALJ for failing to address . . . impairments that [Girao] never indicated [ ]he had." *Vega v. Astrue*, No. 08-CV-1525 (LAP) (GWG), 2009 WL 961930, at *5 (S.D.N.Y. Apr. 6, 2009), *adopted in part by* 2010 WL 2365851 (June 10, 2010).

### b. Any Step Two Error Would Have Been Harmless

Even if the ALJ had been required to consider whether Girao's mental impairments were severe, "[a] step two error is not reversible and does not necessitate remand where the record is devoid of evidence that the allegedly omitted impairments were severe." *Sylvia A. v. Comm'r of Soc. Sec.*, No. 21-CV-885 (VEC) (GRJ), 2022 WL 3566910, at *6 (S.D.N.Y. June 10, 2022) (quoting *Guerra v. Comm'r of Soc. Sec.,* No. 16-CV-991 (MAT), 2018 WL 3751292, at *2 (W.D.N.Y. Aug. 7, 2018), *aff'd,* 778 F. App'x 75 (2d Cir. 2019)), *adopted sub nom.*, *Alvarez v. Comm'r*, 2022 WL 2751860 (July 14, 2022). Indeed, "a specialized variant of harmless-error analysis [applies] with respect to [step two] severity errors[:] . . . [w]hen an administrative law judge identifies some severe impairments at [step two], and then

proceeds through the sequential evaluation on the basis of the combined effects of all impairments, including those erroneously found to be non-severe, an error in failing to identify all severe impairments at [step two] is harmless." *Guerra*, 2018 WL 3751292, at *3 (quoting *Snyder v. Colvin*, No. 13-CV-585 (GLS) (ESH), 2014 WL 3107962, at *5 (N.D.N.Y. July 8, 2014)) (cleaned up); *see also, e.g., Elizabeth Z. v. Comm'r of Soc. Sec.*, 21-CV-0121 (CJS), 2023 WL 2445336, at *5 (W.D.N.Y. Mar. 10, 2023) (same); *Howard*, 203 F. Supp. 3d at 297 (collecting cases). For instance, in *Reices-Colon v. Astrue*, a claimant argued that the ALJ had erred by excluding her anxiety and panic disorders from step two review, but because the ALJ "specifically considered her anxiety and panic attacks" in "subsequent steps, any error was harmless." 523 Fed. App'x 796, 798 (2d Cir. 2013).

Some courts in this Circuit have declined to apply the specialized variant of harmless error analysis where, as here, the ALJ determines that an alleged impairment is not medically determinable. *Elizabeth Z.*, 2023 WL 2445336, at *6 n.7 (courts in this Circuit split on whether to apply "specialized variant"); *see also Isacc R. v. Kijakazi*, No. 20-CV-1172 (ATB), 2022 WL 306364, at *7 (N.D.N.Y. Feb. 2, 2022) ("[T]he step-two harmless error doctrine is inapplicable to a determination that an impairment is not medically determinable.")); *Marc G.,* 2022 WL 675701, at *8 ("[A] finding that conditions are not medically-determinable abnormalities rising to the level of impairments may not be harmless error as it effects [*sic*] subsequent evaluative steps." (cleaned up)). For instance, in *Showers*, the ALJ erred by failing to consider mental impairments at step two and then never considering them "at

subsequent evaluative steps or when formulating Showers' residual functional capacity." 2015 WL 1383819, at *8. However, "[t]he reasoning of this position is . . . unpersuasive" where "the ALJ clearly considered [the alleged] impairment at later stages of the evaluation process." *Elizabeth Z.,* 2023 WL 2445336, at *6 n.7. That is what occurred here.

Here, the ALJ identified Girao's severe impairments at step two ("obesity, degenerative disc disease, cervical radiculopathy, cervical spondylosis, mastoiditis, chronic pain syndrome, tendonitis, and bilateral occipital neuralgia"), and as she proceeded through the RFC analysis, she specifically considered evidence of mental impairments alongside his severe impairments. AR at 16–22. For instance, she considered Dr. Alexander's determination that "[Girao's] attention and concentration were mildly impaired due to physical pain" and that his "mental status exam was otherwise within normal limits." *Id.* at 21. She noted that Girao's psychiatric evaluation with Dr. Blackwell was solely for an occipital nerve stimulator, that Dr. Blackwell concluded that "[t]here was no psychiatric medically determinable impairment," and that consulting psychiatrist Dr. Inman arrived at the same conclusion. *Id.* at 22. She considered Girao's evaluation with Dr. Tsui for psychological readiness for an occipital nerve stimulator and noted Dr. Tsui's diagnosis of chronic pain and somatic symptom disorder alongside her observation that Girao's "[m]ental status examination was within normal limits." *Id.* Finally, she noted that Girao never received regular mental health treatment. *Id.* ("[T]he opinions from Dr. Blackwell and Dr. Inman are persuasive because they are

consistent with the claimant's lack of treatment for any mental health issues."); *see also, e.g.*, *Catherine M.*, 2023 WL 2623590, at *6 ("[I]t is well settled that the ALJ is 'entitled to rely not only on what the record says, but also on what it does not say.'" (quoting *Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983)).  In sum, as the ALJ specifically considered any mental impairments suggested from the record as she proceeded through the sequential analysis, any error at step two with respect to those impairments would have been harmless.  *See, e.g.*, *Reices-Colon,* 523 Fed. App'x at 798.

Likewise, Girao's contention that the ALJ improperly failed to perform the special technique in her analysis, Pl. Mem. at 13, is without merit.  Such an "omission, alone, does not constitute reversible error, especially when, as here," the ALJ "discussed at least some of [the relevant] examination findings . . . and concluded that no 'objective findings' support their diagnoses of . . . mental impairments."  *Showers*, 2015 WL 1383819, at *6; *see also, e.g.*, *Dylan T. D. v. Comm'r of Soc. Sec.*, No. 20-CV-1313 (CJS), 2022 WL 736990, at *3 n.2 (W.D.N.Y. Mar. 11, 2022) ("The Second Circuit has held that where an ALJ's failure to adhere to the regulations' special technique is *not harmless*, failure to apply the 'special technique' is reversible error." (citing *Kohler*, 546 F.3d at 265 n.4) (emphasis added)).[4]  The cases that Girao cites to support this argument involve analytical

---

[4] While some "courts held that the failure to apply the special technique [alone] is not harmless error," *Howard*, 203 F. Supp. 3d at 297 (citing cases), this "line of legal thought is not undisputed."  *Id.* at 298.  Where, as here, Girao did not rest his claim for benefits on any mental impairments yet the ALJ nevertheless discussed Giaro's mental impairments in subsequent steps, remand is

failures not present here.  *See* Pl. Mem. at 15 (citing *Amparo v. Comm'r of Soc. Sec.*,

No. 20-CV-10285 (JMF) (SDA), 2022 WL 3084482, at *11 (S.D.N.Y. July 19, 2022)

(harmless error analysis not applicable because "ALJ found at least mild limitations

in areas of mental functioning"), *adopted by* 2022 WL 3084380 (Aug. 3, 2022);

*Schmidt v. Comm'r of Soc. Sec.*, No. 20-CV-3594 (KAM), 2022 WL 1540054, at *4

(E.D.N.Y. May 16, 2022) ("ALJ failed to explain how . . . non-severe impairments

informed . . . RFC"); *Garcia v. Comm'r of Soc. Sec.*, No. 20-CV-7539 (PAE) (SLC),

2022 WL 1051134, at *17 (S.D.N.Y. Jan. 31, 2022) (mental impairment at issue

found medically determinable by doctors), *adopted by* 2022 WL 970566 (March 31,

2022)).  As has already been discussed, even though the ALJ was not obligated to

determine whether Girao's mental impairments were medically determinable in the

first place, she nevertheless considered them throughout her RFC analysis.  Thus,

remand is not warranted on this ground.

　　　Girao further contends that the ALJ's hypothetical question to the VE at step

five was incomplete for failure to include his claimed mental impairments.  *See* Pl.

Mem. at 15–16.  But as noted, the ALJ provided legally sufficient explanations in

her RFC analysis as to why she did not consider Girao's mental impairments to be

medically determinable or severe, *see, e.g.*, AR at 17, 19–22, and none of the cases

---

inappropriate.  *See, e.g.*, *Hamilton v. Comm'r of Soc. Sec.*, No. 18-CV-6782, 2020 WL
1330706, at *4 (W.D.N.Y. Mar. 23, 2020) ("[U]ncertainty as to whether an ALJ
applied the special technique during the severity stage will not, 'standing alone,
warrant remand or reversal if the ALJ's other findings show that the proper legal
standards were applied and that all of [the claimant's] impairments were properly
considered at all of the subsequent steps.'" (quoting *Booker v. Astrue*, No. 07-CV-646
(GLS), 2011 WL 3735808, at *4 (N.D.N.Y. Aug. 24, 2011)).

cited by Girao dictates a different result.  *See* Pl. Mem. at 15 (citing *McIntyre v. Colvin,* 758 F.3d 146, 152 (2d Cir. 2014) (failure to incorporate "limitations in concentration, persistence, and pace" in hypothetical harmless if "medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations . . . and the challenged hypothetical is limited to include only unskilled work" or "hypothetical otherwise implicitly account[ed] for a claimant's limitations" (cleaned up)); *De Leon v. Sec'y of Health & Hum. Servs.*, 734 F.2d 930, 936 (2d Cir. 1984) (omission of "severe" impairments from hypothetical warranted remand)).[5]  In sum, the ALJ did not commit any reversible errors with respect to Girao's claimed mental impairments.

## 2.  The ALJ Properly Evaluated Dr. Heckman's Opinion

SSA regulations require the ALJ to explicitly discuss the supportability and consistency of each medical opinion in making the RFC determination, and the failure to do so constitutes legal error.  *See, e.g., Acosta-Cuevas*, 2021 WL 363682, at *14 (regulations "require an ALJ to explain how persuasive she found the medical opinions she considered, and specifically, how well a medical source supports their own opinion(s) and how consistent a medical source/opinion is with the medical evidence as a whole"); 20 C.F.R. § 404.1520c(a) ("The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior

---

[5] Girao points out that a surveillance system monitor, one of the jobs identified by the VE, allows for no off-task behavior.  Pl. Mem. at 15.  However, it is the ALJ's burden to identify only one job existing in the national economy that Girao can perform, 20 C.F.R. § 404.1566(b), and Girao challenges no other positions identified by the VE.

administrative medical findings are supportability . . . and consistency.").  The ALJ
must "explain her findings regarding the supportability and consistency for each of
the medical opinions [by] pointing to specific evidence in the record supporting those
findings," *Raymond M. v. Comm'r of Soc. Sec.*, No. 19-CV-1313 (ATB), 2021 WL
706645, at *8 (N.D.N.Y. Feb. 22, 2021) (cleaned up), and is "free to reject portions of
medical-opinion evidence not supported by objective evidence of record, while
accepting those portions supported by the record." *Lisa T. v. Comm'r of Soc. Sec.*,
No. 21-CV-469 (DB), 2023 WL 203363, at *5 (W.D.N.Y. Jan. 17, 2023).

Girao contends that the ALJ failed to sufficiently explain the supportability
and consistency of Dr. Heckman's opinion in making the RFC determination.  *See*
Pl. Mem. at 16–20.  Specifically, he argues that the ALJ made only "conclusory
statement[s]" that are inadequate because they do not "account for [Girao's] well-
documented mental impairments."  *Id.* at 12.  The Court addresses the adequacy of
the ALJ's supportability and consistency analyses seriatim.

### a. Supportability

Supportability "has to do with the fit between the medical opinion offered by
the source and the underlying evidence and explanations presented by that source
to support her opinion." *Rivera*, 2020 WL 8167136, at *16 (cleaned up).  "The more
relevant the objective medical evidence and supporting explanations presented by a
medical source are to support his or her medical opinion(s) or prior administrative

medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(1).

At issue here is the ALJ's review of Dr. Heckman's responses to a "physical functional capacity assessment form on June 20, 2019," where she noted Dr. Heckman's observations that Girao "had constant, debilitating chronic neck pain going up into his skull," his "symptoms are constantly severe enough to interfere with attention and concentration," "he was capable of significantly less than a full range of sedentary work, he would need to take unscheduled work breaks, and he only has bad days." AR at 20. The ALJ also accounted for Dr. Heckman's finding that Girao would be "unable to work at this time," and concluded it was unpersuasive because "the extreme limitations" he found were "based solely on the claimant and his mother's subjective complaints." *Id*.

As a general matter, "consideration of a patient's report of complaints, or history, as an essential diagnostic tool, is a medically acceptable clinical and laboratory diagnostic technique," and, in the case of mental impairments, "[t]here is nothing amiss about an acceptable medical source relying on subjective symptoms to form a diagnosis." *Showers*, 2015 WL 1383819, at *8 n.18 (quoting *Santana v. Astrue*, No. 12-CV-815 (BMC), 2013 WL 1232461, at *14 (E.D.N.Y. Mar. 26, 2013)) (cleaned up); *see also Tammy T. v. Kijakazi*, No. 21-CV-1, 2022 WL 71995, at *12 (D. Vt. Jan. 7, 2022) ("When a psychiatrist accepts what the patient is saying and incorporates their expression of their subjective experience into their notes and opinion, the court should rely on that opinion even if there is not any outwardly

measurable manifestation of the impairment as would be available in physical impairment cases."). However, as Dr. Heckman relied on subjective complaints to complete a "*physical* functional capacity assessment form," AR at 20 (emphasis added), it was permissible for the ALJ to note, when analyzing for supportability, that Dr. Heckman's findings were based on subjective complaints. *David C.*, 2023 WL 2379007, at *11 ("[T]he ALJ is not required to credit Plaintiff's reports of pain, and . . . the ALJ adequately explained why he did not find Plaintiff's complaints entirely credible.").

Moreover, Girao's objection that the ALJ's analysis was "speculative," Pl. Mem at 18; Pl. Reply at 5, is without merit, as all of Dr. Heckman's findings that Girao points to were indeed based on subjective statements, not "abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1521; *see* Pl. Mem. at 18 (summarizing Dr. Heckman's treatment and findings, all of which were based on subjective complaints); AR at 20 (summarizing same treatment record and concluding that Dr. Heckman's findings were based on subjective complaints); *see also Pokluda v. Colvin*, No. 13-CV-335 (GLS) (ESH), 2014 WL 1679801, at *9 (N.D.N.Y. Apr. 28, 2014) ("medical 'findings'" claimant pointed to "was mere dictation of what [she] complained of by history"). The supportability requirement is thus met.

**b. Consistency**

"Consistency is an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record, not just what a medical

source had available to them." *Acosta Cuevas*, 2021 WL 363682, at *10.  An ALJ is

"expressly authorized—indeed, required—to consider whether [a physician's]

opinion [is] consistent with the entire record."  *DuBois v. Comm'r of Soc. Sec.*, No.

20-CV-8422 (BCM), 2022 WL 845751, at *8 (S.D.N.Y. Mar. 21, 2022) (quotation

marks omitted).  The ALJ must specifically set forth how she considered the

consistency of a medical opinion in the analysis of that opinion.  *See, e.g.*, *Darla W.

v. Comm'r of Soc. Sec.,* No. 20-CV-1085, 2021 WL 5903286, at *10 (N.D.N.Y. Dec.

14, 2021) ("The ALJ should articulate how persuasive [s]he finds each medical

opinion under the supportability and consistency factors." (quoting

§ 404.1520c(b)(2))).

Here, the ALJ concluded that Dr. Heckman's opinion was "inconsistent with

the objective findings, which are unremarkable."  AR at 20.  Girao argues that this

statement is legally insufficient because it fails to consider the whole record.  Pl.

Mem. at 20.  However, the ALJ's conclusion should not be read in isolation: it

followed a thorough discussion of medical findings in the record and their lack of

consistency with statements made by Girao and his mother.  *See, e.g.*, *Maria S. v.

Commissioner of Social Security,* No. 21-CV-544 (NAM), 2022 WL 3017373, at *6

(N.D.N.Y. 2022) ("[T]he ALJ's evaluation of consistency should not be read in

isolation but rather in the context of the complete decision.").  The ALJ discussed

the findings of three different medical experts who Girao saw after Dr. Heckman,

who each concluded that his results were normal.  *See* AR at 18–19 (Dr. Katus); *id.* at 21 (Dr. Alexander); *id.* at 22 (Dr. Tsui).[6]

Girao cites to *Kathleen A. v. Commissioner, see* Pl. Mem. at 20, where the consistency factor was not met because the ALJ's analysis of a medical opinion "lack[ed] any reference" to other sources and merely relied on the contradiction between the doctor's stated restrictions and his own records.  2022 WL 673824, at *6.  But here, the ALJ discussed the "objective" findings in the record that did not support Dr. Heckman's findings.  *See, e.g.*, AR at 18 (Dr. Katus: "[m]otor strength was full at 5/5 throughout"); *id.* at 21 (Dr. Winfree: "the imaging studies did not show a structural cause for his symptoms"); *id.* at 18 (Dr. Das: "[c]ranial nerves, motor exam, and sensory exam were normal . . . the cervical MRI showed minimal disc bulging, and in-house x-rays were normal"); *id.* at 22 (Dr. Tsui: "[m]ental status examination was within normal limits").  In light of those results, it was reasonable for the ALJ to conclude that Dr. Heckman's opinion was "inconsistent with the objective findings, which [were] unremarkable."  *Id.* at 20.

The ALJ must not "cherry pick" evidence that "supports" her "RFC determination while ignoring other evidence to the contrary," *Jackson,* 588 F. Supp. 3d. at 585 (cleaned up), but the ALJ did not "cherry pick" here.  She acknowledged Dr. Heckman's conclusion that Girao's chronic pain symptoms were severe enough to interfere with attention and concentration, but also noted that a cervical MRI

---

[6] As discussed *supra*, in addition to concluding that Girao's "Mental status examination was within normal limits," Dr. Tsui diagnosed Girao with chronic pain syndrome and somatic symptom disorder.  AR at 22.

conducted two months after Girao's visit showed "no significant disc herniation or abnormal enhancement." AR at 20. She further observed (only a few days prior to Girao's visit with Dr. Heckman), Dr. Sankar's conclusion that Girao's complaints "could not be explained on the basis of imaging," and that the neurologic exam was unremarkable. *Id.* Dr. Sankar's findings are inconsistent with Dr. Heckman's assessment that Girao's "symptoms [were] constantly severe enough to interfere with attention and concentration." *Id.* In sum, the ALJ discussed each medical opinion and then explained why Dr. Heckman's determination was inconsistent with the others. *Id.* at 18–22. This approach was permissible.

### c. The ALJ Adequately Assessed Girao's Subjective Complaints

Girao argues that the ALJ impermissibly "played doctor," interpreting objective medical evidence "without guidance from a medical professional" because she "rejected Dr. Heckman's opinion, Dr. Healy's opinion and the opinions of the state agency medical consultants to craft the RFC." Pl. Mem. at 20.[7] Under the current regulations, the ALJ may not use her "own lay opinions to fill evidentiary gaps in the record." *Manzella v. Comm'r of Soc. Sec.*, No. 20-CV-3765 (VEC) (SLC), 2021 WL 5910648, at *14 (S.D.N.Y. Oct. 27, 2021), *adopted by* 2021 WL 5493186

---

[7] To make this argument, Girao relies exclusively on cases applying the outdated "treating physician" rule, which required the ALJ to give more weight to the treating physician's medical opinion. *See, e.g.,* Pl. Mem. at 21 (citing cases from 2000 and 2003, respectively). As discussed *supra*, the treating physician rule was removed from SSA regulations in 2017, and the ALJ is therefore no longer required to afford more weight to Dr. Heckman's opinion. *Luis A. C. R. v. Commissioner of Social Security,* 2023 WL 2743909 at *5 (W.D.N.Y. 2023) (citing Revisions to Rules Regarding the Evaluation of Medical Evidence, 2017 WL 168819, at *5856)).

(Nov. 22, 2021).  However, the ALJ is permitted—indeed required—to consider the findings of other medical providers who conducted objective testing.  *See, e.g.*, *Lisa T.*, 2023 WL 203363, at *5 (ALJ is "free to reject portions of medical-opinion evidence not supported by objective evidence of record, while accepting those portions supported by the record").  Thus, Girao's argument that the ALJ impermissibly substituted her own opinion for those of the medical professionals fails.

Finally, Girao's contention that the ALJ improperly dismissed Dr. Heckman's opinion for relying on subjective complaints because "chronic pain syndrome . . . cannot be quantified by objective testing," Pl. Mem. at 20, is also without merit, as the ALJ properly considered Giaro's subjective complaints.

It is well-established that "[i]f the objective medical evidence does not substantiate the claimant's symptoms, the ALJ must consider the other evidence." *Elizabeth B. v. Comm'r of Soc. Sec.*, No. 21-CV-100 (TWD), 2022 WL 17721254, at *8 (N.D.N.Y. Dec. 15, 2022) (quoting *Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013)).  Specifically, the ALJ must consider the following symptom-related factors: "(1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms."  *Id.* (citing 20 C.F.R.

§§ 404.1529(c)(3), 416.929(c)(3)) (applied where chronic pain syndrome found to be a severe impairment).

In this case, the ALJ explained:

> [Girao's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [his] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. As discussed below, objective testing is wholly unremarkable. While [Girao] alleges excruciating and debilitating pain, the medical evidence of record reflects that it is his mother who speaks for him during doctor visits. There are indications that she coaches the claimant to scream in pain if something hurts. The claimant has no mental diagnosis and is not treating for any mental issues—no therapy and no medication. [Girao] did have a successful occipital stimulator trial that provided relief, but it doesn't appear that he ever followed through with the permanent implant. As to activities of daily living, the medical evidence of record reflects that [Girao] watches YouTube videos and listens to music, he exercises three times per week, and he testified that he recently designed a website that runs on his laptop.

AR at 17–18.

The above explanation is legally adequate: first, because it specifically addressed each of the above-listed symptom-related factors, and second, because "[i]t is the role of the Commissioner, not the reviewing court, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including with respect to the severity of a claimant's symptoms." *Cichocki*, 534 F. App'x at 75 (cleaned up); *see also Stanton v. Astrue*, 370 F. App'x 231, 234 (2d Cir. 2010) ("We have no reason to second-guess the credibility finding in this case where the ALJ identified specific

43

record-based reasons for his ruling.").  Thus, "the Court finds no basis to disturb the ALJ's evaluation of [Girao's] subjective complaints, which is supported by record-based explanations throughout the ALJ's written decision."  *Elizabeth B.*, 2022 WL 17721254, at *12.

### 3. The ALJ's RFC Determination Was Supported by Substantial Evidence

Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a certain conclusion."  *Selian*, 708 F.3d at 417. Beyond the issues presented by Girao, a review of the ALJ's decision demonstrates that she carefully considered each piece of the medical record.  Where a divergence in medical opinions required her to make a choice from the bases upon which they were drawn, her explanations were legally adequate, and her conclusions were supported by substantial evidence, thus requiring deference from the Court.  *See, e.g.*, *Smith*, 740 F. App'x at 725 ("The ALJ could have reached a different conclusion on the disputed medical record, but we defer to the ALJ's disability determination when it is supported by substantial evidence."); *Jeffrey G.*, 2021 WL 4844146, at *6 ("After careful consideration of the parties' arguments and the evidence of record, this court finds that the ALJ's decision to omit carpal tunnel syndrome as a medically determinable impairment is supported by substantial evidence.").

## III. CONCLUSION

For the foregoing reasons, Girao's motion is denied, the Commissioner's cross-motion is granted, and the case is dismissed.  The Clerk is directed to mark the

motion at Docket Number 16 "denied," the motion at Docket Number 19 "granted,"

and to enter judgment for the Commissioner.

      **SO ORDERED.**

Dated: August 18, 2023
     New York, New York

                                 JAMES L. COTT
                                 United States Magistrate Judge